UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

FIRST TENNESSEE BANK            ]
NATIONAL ASSOCIATION            ]
                                ]
v.                              ]        No. 1-05-0027
                                ]        Judge Haynes
MIKE JOHANNS, in his capacity   ]
as Secretary of U.S. Department ]
of Agriculture for and on       ]
behalf of its Agency, the Rural ]
Business-Cooperative services   ]
a/k/a Rural Development          ]

M E M O R A N D U M

Before the Court is Plaintiff's motion (filed March 31, 2006;

Docket Entry No. 17) for judgment in its favor on the

administrative record and its memorandum (filed March 31, 2006;

Docket Entry No. 18) in support; the defendant's motion (filed

March 31, 2006; Docket Entry No. 16) for judgment in its favor on

the administrative record and its memorandum (filed March 31, 2006;

Docket Entry No. 19) in support; and the plaintiff's response

(filed April 17, 2006; Docket Entry No. 23) in opposition to the

defendant's motion. The Court also has before it the plaintiff's

motion (filed March 31, 2006; Docket Entry No. 20) for a hearing

and oral argument and the defendant's response (filed April 4,

2006; Docket Entry No. 22) in opposition.

Plaintiff, First Tennessee Bank National Association, filed

this action under the Administrative Procedure Act, 5 U.S.C. §§ 701

et seq., seeking judicial review of the decision of the Secretary

of the United States Department of Agriculture ("USDA").
Plaintiff's claim arises from the Secretary's determination of its
liabilities under a loan through the Rural Development Business and
Industry loan program in the USDA.

With the administrative record and the briefs of the parties,
the Court concludes that oral argument is not necessary in this
case, and Plaintiff's motion (Docket Entry No. 20) for oral
argument is denied.

For the reasons set forth below, the Court shall affirm in
part and deny in part the findings of the Secretary's decision.
Plaintiff shall be awarded $359,373.84 on its Loss Claim.

## I.   REVIEW OF THE RECORD

Plaintiff, First Tennessee Bank National Association, ("FTB"),
is a banking institution with offices in Nashville, Tennessee.  FTB
is the successor in interest to Peoples and Union Bank, ("PUB"), a
bank formerly organized and existing under Tennessee law, with
offices and place of business in Pulaski, Giles County Tennessee.
PUB was a wholly-owned subsidiary of FTB.

On March 24, 1998, Magna Metal Finishing, Inc., ("MMF"),
located in Pulaski, Tennessee, applied to PUB for a guaranteed loan
through the United States Department of Agriculture Rural
Development Business and Industry loan program in the amount of
$1,300,000.  Docket Entry No. 11, Certified transcript, Volume II

2

at 920.[1]  The reason for the B&I loan was to purchase new equipment for MMF'S plant in Pulaski and to refinance $47,500 in its existing debt.  The loan was to be secured by a first lien on machinery and equipment at a value of $1,750,129.  Id.

MMF's loan application reflected that, as of February 28, 1998, it had fixed assets of $671,820 (including equipment valued at $437,592), liabilities in the amount of $261,457, and tangible balance sheet equity of $508,655 (61.08%).  Id. at 921.  The application projected that after loan closing MMF would have assets of $1,933,028, liabilities in the amount of $1,464,373, and tangible balance sheet equity of $528,655 (20.19%).  The application reflects that MMF was to contribute $59,800 for fees and $29,584 for debt restructuring for a total contribution amount of $89,384.  On March 27, 1998, PUB certified the loan application.  Id. at 920.  During March and April 1998, and prior to the loan

_____

[1]     The purpose of the B&I Guaranteed Loan Program is to improve, develop, or finance business, industry, and employment and improve the economic and environmental climate in rural communities.  This purpose is achieved by bolstering the existing private credit structure through the guarantee of quality loans which will provide lasting community benefits.  It is not intended that the guarantee authority will be used for marginal or substandard loans or for relief of lenders having such loans.

7 C.F.R. § 4279.101(b).

3

closing, MMF leased equipment from Leasing Technology, Inc., ("LTI"), for $335,000. Id. at 921; Vol. I at 151, 190-91, 263.

On May 14, 1998, the Rural Business-Cooperative Service, an agency under the USDA and also known as Rural Development, approved the guaranteed loan application. Id. On May 22, 1998, the RBCS issued its Conditional Commitment for Guarantee to PUB, specifying that the funds from the B&I loan were to be used for machinery and equipment (approximately $1,252,500) and debt refinancing (approximately $47,500). Id. The Conditional Commitment also stated, in pertinent part, that:

> 1. the lender would furnish Rural Development a disbursement statement at the closing of the loan showing the disbursement of all funds for the project, including the loan funds;
>
> 2. the lender was prohibited from disbursing any of the loan funds under the guarantee to the individual owner(s), partner(s), stockholder(s) or beneficiary of the borrower or a close relative of such an individual when such an individual would retain any portion of the ownership of the borrower;
>
> 3. the lender determine that the owners had good and marketable title to the security in connection with the loan and that they enjoyed peaceful and undisturbed possession of that security;
>
> 4. the lender and borrower certify that they received a copy of Rural Development Instructions 4279-A, 4279-B, and 4287-B pertaining to business and industrial loans;
>
> 5. the lender certify that it understood that pursuant to RD Instruction 4279-B, section 4279.181(m), no adverse changes were to occur during the period of time from the Agency's issuance of the Conditional Commitment to the issuance of the Loan Note Guarantee relating to Magna, regardless of the cause or causes of the change and

4

whether the change or cause(s) of the change were within the lender's or borrower's control;

6. prior to the issuance of the Loan Note Guarantee, the lender must make certification in accordance with RD Instruction 4279-B, section 4279.181;

7. prior to the issuance of the Loan Note Guarantee, the lender would provide the Agency with a certification that the borrower had a tangible balance sheet equity position of a minimum of twenty percent (20%) determined in accordance with Generally Accepted Accounting Principles; and

8. the lender would furnish at the loan closing an opinion of the lender's counsel certifying that all conditions of the Conditional Commitment and Term Loan Agreement had been complied with by the parties.

Id., Vol. I at 10-13; Vol. II at 921.

Although MMF had earlier leased equipment from LTI, in a letter dated, June 9, 1998, PUB's counsel stated that they had examined the appropriate lien searches relating to MMF's property and that there were no liens on record, as of that date, with respect to the property of the Borrower. Id., Vol. I at 151, 192-94. This letter reads, in part, "Borrower is the absolute owner of all property given to secure the repayment of the loan, free and clear of all liens, encumbrances, and security interests." Id. at 194. On June 9, 1998, PUB certified that MMF owned all of its equipment free and clear of all liens and encumbrances and security interests and accepted the conditions of the Conditional Commitment for Guarantee, signing the Lender's Agreement and closing the loan. Id.; Vol. II at 921. Thus, PUB agreed to use the loan for the

purposes authorized in 7 C.F.R. § 4279, in accordance with the provisions of the Conditional Commitment for Guarantee. Id.

On June 16, 1998, PUB submitted a settlement statement to RBCS showing the following loan disbursements:

| | |
|---|---|
| Total Settlement charges | $84,727 |
| Disbursement to Others: | |
| First Peoples Bank | $91,741 |
| Citizens First Bank | $144,498 |
| Oak Ridge Tool-Engineering Inc. | $44,451 |
| Ganton Technologies Inc. | $7,000 |
| Kenneth W. Altum | $54,140 |
| Ontario LTD | $20,000 |
| Dr. Sood | $109,000 |
| Leasing Technology | $369,000 |
| Vendors to be paid | $254,506 |
| Reserve Account-Peoples and Union Bank | $80,000 |
| Disbursements to borrower | $40,935 |
| Total Disbursements | $1,300,000 |

Id. at 922.

On July 1, 1998, MMF entered into a $65,000 lease with Ganton Technologies. Id. at 581, 790. On July 8, 1998, LTI informed Magna Metal that the lease on the equipment had been completed, that MMF's account was terminated and that LTI released its interest in the equipment. Id. at 702-04. Albert Nother, a partner in MMF, stated that there was some early payoff penalties attached to the LTI loans that were not anticipated. Id., Vol. I at 197. According to Nother, all of the unexpected expenses and penalties put a strain on MMF's finances. Id. at 198.

On August 26, 1998, RBCS issued an eighty percent (80%) Loan Note Guarantee of $1,300,000. Id., Vol. II at 922. The Loan Note Guarantee stated:

6

The Loan Note Guarantee constitutes an obligation
supported by the full faith and credit of the United
States and is incontestable except for fraud or
misrepresentation of which Lender or any Holder has
actual knowledge at the time it became such Lender or
Holder or which Lender or any Holder participates in or
condones. The guarantee will be unenforceable to the
extent that any loss is occasioned by a provision for
interest on interest. In addition, the Loan Note
Guarantee will be unenforceable by Lender to the extent
any loss is occasioned by the violation of usury laws,
negligent servicing, or failure to obtain the required
security regardless of the time at which USDA acquires
knowledge of the foregoing. Any losses occasioned will
be unenforceable to the extent that loan funds are used
for purposes other than those specifically approved by
USDA in its Conditional Commitment for Guarantee.
Negligent servicing is defined as the failure to perform
those services which a reasonably prudent lender would
perform in servicing (including liquidation) its own
portfolio of loans that are not guaranteed. The term
includes not only the concept of a failure to act but
also not acting in a timely manner or acting in a manner
contrary to the manner in which a reasonably prudent
lender would act up to the time of loan maturity or until
a final loss is paid.

<u>Id</u>., Vol. I at 16.[2]

---

[2]Similarly, the Lender's Agreement provided, in part, the
following:

The Loan Note Guarantee will be unenforceable by the
Lender to the extent any loss is occasioned by . . .
negligent servicing . . . regardless of the time at which
USDA acquires knowledge of the foregoing. Any losses
will be unenforceable by the Lender to the extent that
loan funds are used for purposes other than those
specifically approved by USDA in its Conditional
Commitment for Guarantee. Negligent servicing is defined
as the failure to perform those services which a
reasonably prudent Lender would perform in servicing its
own portfolio of loans that are not guaranteed. The term
includes not only the concept of a failure to act but
also not acting in a timely manner or acting in a manner
contrary to the manner in which a reasonably prudent
Lender would act up to the time of loan maturity or until

According to James Pope, a loan packager[3] who packaged the loan for MMF, MMF was doing well in late 1998 and early 1999 and was showing a small profit. Id. at 195. In his affidavit, Robert E. Wiles, Jr., PUB's Senior Vice President, states that during calendar years 1998, 1999, and 2000, MMF generally paid the USDA Loan as agreed. Id., Vol. II at 794. Yet, MMF experienced significant financial difficulties when Breed Technologies, one of its primary customers, filed for bankruptcy and did not pay its accounts to MMF according to the terms of their contract. Id. at 795. Additionally, Ganton Industries, another primary customer of MMF's, cutback on its contract requirements from MMF's Pulaski plant during this same period of time. Id. at 795; Vol. I at 195. In January 2001, MMF became delinquent on its loan and subsequently filed for bankruptcy.[4] Id. at 922.

According to Vijay Jethanandani, MMF'S head partner, several problems led to MMF's downfall. Id., Vol. I at 199. In his view, MMF did not borrow sufficient funds at the beginning and had to pay unexpected fees associated with the interim loans. Both

_____

a final loss is paid.

Id. at 18.

[3]A loan packager organizes all of the borrower's financial information, taxes, etc., in order to enable a borrower to obtain a loan. He gathers all of the paperwork and does an analysis for the USDA and the bank.

[4]Magna Metal is no longer in business.

8

Jethanandani and Nother cited Breed Technologies' bankruptcy and Chrysler pulling a contract from the Huntsville, Alabama, plant as contributors to MMF's downfall. Id. at 198-99.

In April 2001, PUB merged with First Farmers and Merchants Bank of Columbia, Tennessee. Id., Vol. II at 922. MMF's loan was endorsed over to FTB. On April 17, 2001, RBCS approved FTB as the substitute lender for the MMF loan. FTB liquidated the loan, and on November 1, 2001, filed a final loss claim with RBCS for $1,086,873.84. Id.

On December 31, 2001, RBCS requested the USDA Office of Inspector General to investigate the MMF loan. On May 20, 2003, the OIG issued its report on the loan that revealed the following:

1. Magna Metal obtained bridge loans in excess of $710,000 prior to loan approval. Loan funds were used to pay:

i. $91,740.99 to First Peoples Bank to pay off a signature loan obtained by Vitay Jethanandani, M.D. (One of the owners and C.E.O. of Magna Metal) on April 10, 1998. Part of the loan was used as down payment on equipment that was being purchased from Gardner Auction Co. and financed by LTI.

ii. $144,539.47 to Citizens First Bank to pay off a loan for equipment. Equipment was used to secure this loan.

iii. $54,140.26 to Ken Altum for a personal loan he made to Magna Metal. The use of proceeds from this loan could not be determined.

iv. $109,000 to Rakesh Sood, M.D. for a personal loan made to Dr. Jethanandani, of which $90,000 was paid to Magna Metal, $10,000

9

was paid to Dr. Jethanandani to reimburse him for prior expenses and $9,000 was for administrative costs of the loan.

v. $369,000 was paid to LTI to pay off two equipment loans. These loans were secured with Magna Metal's existing equipment as well as new equipment.

2. Magna Metal submitted documentation at the time of loan application showing fixed assets valued at $497,629. However, Magna Metal did not have clear title to the fixed assets. A financial statement of March 11, 1998, showed that LTI had a $150,000 first lien on all of Magna's equipment, which was the same equipment listed as fixed assets on the Application for Loan Guarantee. A second financial statement, dated April 20, 1998, showed an additional $185,000 first lien on equipment purchased by Magna Metal.

3. The lender disbursed loan proceeds from the guaranteed loan for $84,727 in settlement charges that were supposed to have been paid from the borrowers' personal funds, and $40,935 was disbursed to the borrower.

Id. at 922-23.

In an interview conducted by the OIG, Dan Beasley, RBCS's director, stated that any interim loans obtained by MMF should have been discussed and approved by the USDA. Id., Vol. I at 155, 158. RBCS cannot recall a guaranteed loan once it has been issued. Id. at 158. Usually, if there is a known violation and the borrower is behind on the loan payments, the RBCS will claim the loan is in default and force the lender to consider alternatives such as foreclosure and liquidation prior to bankruptcy. Id. Beasley further stated that if interim loans were to have been used to purchase equipment, the "USDA most likely would have approved

them." However, there was no record in the files that the USDA was ever made aware of such loans. Id.

On June 17, 2003, RBCS denied the plaintiff's final loss claim, finding that the loan application submitted to RBCS had serious misrepresentations that would have made the business ineligible for the B&I loan program had RBCS been made aware of the true facts and because the lender allowed the borrower to use the loan proceeds for unauthorized purposes. Id.; Vol. II at 923.

On October 31, 2003, Suzanne Beavers, a rural business specialist with the USDA Rural Development in Lawrenceburg, Tennessee, reviews loan applications from the loan origination through the servicing on the business loans. Id. at 549-50. MMF's loan was the first loan she processed, and she was still learning at the time. Id. at 613. According to Beavers, initially there had not been any issues raised by September and October of 1999 regarding the use of loan proceeds to pay the refinance debt of MMF. Id. at 570. In 1998 and 1999, Beavers had two loans where the proceeds exceeded the 50 percent (50%) maximum allowed to be used to refinance debt, and as a result, the national office requested her office to send a letter to the lenders to determine the reason for going over 50 percent (50%). Id.; 536, 903. Beavers further testified that the USDA was not always that strict in enforcing its restriction against allowing more than fifty percent (50%) of loan proceeds to be used to refinance debt and

11

that by October 1999, both the USDA and PUB were aware that more than fifty percent (50%) of the MMF loan went to pay refinance debt. Id. at 570-72.

When asked if the USDA would have pulled the loan note guarantee or threaten not to honor it upon learning of the refinancing in October 1999, Beavers answered no and stated that at that point the USDA could not have done anything except not pay off under the guarantee. Id. at 572. According to Beavers, if MMF had informed them at the time of the loan that it needed to use the loan proceeds to pay bridge loans for new equipment, the USDA would have waived any objection to the use of the proceeds for such a purpose. Id. at 572, 559. However, Beavers had never experienced a borrower telling her that it was using USDA funds to satisfy bridge loans and then asking her to modify the commitment to allow it to do so. Id. at 559. Nor had Beavers known of such a situation ever happening in general; although, she could have given her approval for refinancing if she had been requested to do so. Id. Lastly, Beavers agreed that if the lender had a first priority security interest over the equipment then the USDA's argument regarding the refinancing as a basis for denying the loss claim would be negated. Id. at 573.

On April 28, 2004, RBCS recalculated MMF's tangible balance sheet equity at eleven percent (11%) based on the following equation: total tangible assets of $671,820 (per balance sheet of

12

2/28/98) minus total liabilities of $596,457 ($261,457 per balance sheet of 2/28/98, plus $335,000 LTI debt) equals tangible balance sheet equity of $75,363. RBCS's regional director then determined that the denial of the loss in full was justified and was substantiated by the evidence in the OIG report. FTB subsequently appealed this decision to the National Appeals Division, ("NAD"). Id.

After a hearing and submission of documentary evidence, the NAD hearing officer determined that RBCS did not err in denying the FTB's final loss claim for the MMF loan. The NAD hearing officer determined that the plaintiff's predecessor allowed MMF to use loan proceeds for unauthorized purposes in violation of the Conditional Commitment for Guarantee, that MMF misrepresented its financial position to meet the minimum twenty percent (20%) tangible balance sheet equity and that the plaintiff was responsible for the actions and omissions of its predecessor. Id.

On July 9, 2004, FTB filed a Request for Director Review of the NAD hearing officer's decision. Id. at 955-71. On October 12, 2004, the Deputy Director of the USDA/NAD issued its Director Review Determination upholding the NAD hearing officer's determination, and by extension, the USDA's original adverse decision to deny the plaintiff's Loan Loss Claim in full. Id. at 917-33. In his opinion, the Deputy Director stated that, as a lender, PUB had the primary responsibility for the successful

13

delivery of the B&I loan program and rejected FTB's attempt to shift the responsibility for the loss to RBCS. Id. at 924. This opinion reads, in pertinent part:

> [First Tennessee], as an approved substitute lender, is responsible for its predecessor's errors made in processing Magna's application and loan. [First Tennessee] knew that the loan was in trouble when it took it over as substitute lender. The record shows that [First Tennessee's] predecessor closed the Magna loan despite misrepresentations about the borrower's financial status contained in the application and its attachments. [First Tennessee's] predecessor should have uncovered and reported these changes to RBCS. Further, [First Tennessee's] predecessor improperly disbursed loan proceeds for unauthorized purposes. [First Tennessee's] predecessor used loan proceeds to pay off interim or "bridge" loans that were not identified in the loan application, and did so without approval by RBCS. Had [First Tennessee] done a proper investigation before becoming the substitute lender, it might have decided not to do so or could have obtained consideration from PUB to cover potential losses. The evidence concerning RBCS's alleged complacence with respect to misrepresentations on the application and disbursement report is not persuasive. Moreover, even if the evidence showed that RBCS was aware of the misrepresentations, [First Tennessee's] predecessor had an independent duty to follow up the applicable regulations.

Id.

The Deputy Director did, however, vacate the portion of the NAD hearing officer's decision on the calculation of the tangible balance sheet equity requirement. Id. at 931-32. The NAD hearing officer had found the tangible balance sheet equity to have been eleven percent (11%) or less than the twenty percent (20%) minimum equity needed for loan approval and the issuance of the Loan Note Guarantee. Id., Vol. I at 280-81. In its appeal to the Deputy

14

Director, FTB argued that the USDA erroneously arrived at its calculation of less than twenty percent (20%) equity because the USDA included in its calculation only MMF's debt incurred in acquiring equipment and excluded any value attributable to the equipment acquired thereby. Complaint (Docket Entry No. 1), attachment thereto, Exhibit B, ¶ 20. FTB also argued that under the Agency's regulations, 7 C.F.R. § 4279.131(d), a minimum of twenty percent (20%) tangible balance sheet equity is required at the time the Loan Note Guarantee is issued and not at the time the guaranteed loan is approved. Id., ¶ 35.

In his opinion, the Deputy Director addressed this valuation issue:

> It appears that there may be some merit to [First Tennessee's] contention about RBCS's calculation of equity. In addition, [First Tennessee] notes that the regulatory requirement for 20 percent tangible balance sheet equity is applicable at the time of the issuance of the loan guarantee, rather than at the time of loan application. However, even if RBCS's position is incorrect, there are sufficient other grounds to support the adverse decision. Thus, rather than engaging in a lengthy analysis of an issue that [First Tennessee] maintains should never have been raised, I vacate this part of the Hearing Officer determination.

(Docket Entry No. 11, Certified transcript, Volume II at 932). The Deputy Director concluded:

> In summary, [First Tennessee's] predecessor made a loan that was based on misrepresentations and omissions. [First Tennessee's] predecessor failed to comply with the B&I loan regulations that required it to properly make, secure, and service the loan, as it would reasonably do in servicing its own loan portfolio. [First Tennessee's] predecessor failed to take certain actions and make

15

disclosures of information that may have led to denial of the loan guarantee had USDA been fully apprised of the borrower's financial status.

Id. at 932.

In its appeal to this Court, FTB contends that the Court should overturn the USDA's decision because it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of the USDA's statutory authority or limitations; and unsupported by substantial evidence. FTB's specific contentions are that:

a. the USDA based its decision to deny the Loan Loss Claim upon a misinterpretation of the factual and legal effect of matters set forth in the OIG Report, including the secured transaction with LTI;

b. the USDA persisted in misinterpreting the factual and legal effect of the transaction until it was partially recognized by the Director's Review in vacating the primary ground upon which the USDA based its decision to deny the Loan Loss Claim (the alleged failure to meet the 20% equity requirement);

c. despite the Director's Review vacating the erroneous basis for the USDA's decision, he failed to recognize that the effect of his determination undercut the remaining bases for upholding the USDA's decision to deny the Loan Loss Claim in its entirety; specifically, that the alleged failure to meet the equity requirement constituted a misrepresentation by the Borrower and the failure to discover and report it was "negligent servicing" on the part of First Tennessee's predecessor;

d. the USDA ignored, or failed to understand, that the factual and legal effect of the transactions with LTI and others for interim or bridge financing only served to allow the Borrower to timely obtain the equipment contemplated by the Conditional Commitment as Collateral for the Loan, and such interim loans were extinguished by the Loan Closing, such that First Tennessee's predecessor

16

ended up with the exact assets, liabilities and equity required by the Conditional Commitment;

e. even though the net effect of these transactions added assets to the Borrower and resulted in a net increase in the Borrower's equity, the USDA (in hindsight) characterized such transactions as "adverse changes in condition," that the Borrower's failure to affirmatively disclose them was a "misrepresentation," and that the failure of First Tennessee's predecessor to discover and report such transactions prior to closing was "negligent servicing;"

f. despite the testimony of the USDA's own representative to the effect that a requested refinancing of such "interim loans" would have been approved and that the failure to request such refinancing should not be the basis for denying the Loan Loss Claim, and despite indications in the USDA's files that it was aware of the refinancing of interim loans, the USDA simply ignored such proof and partially based its denial of the Loan Loss Claim on "use of funds for unauthorized purposes," i.e., to pay off loans that allowed the Borrower to timely obtain the equipment rather than waiting for the ultimate Loan Closing and using the funds from First Tennessee's predecessor to acquire the same equipment;

g. despite being provided with the Closing Statement and other documentation from the Loan Closing showing the payment and release of the interim financing loans, the USDA claimed to have no notice of such information, or if it did have such information, that it had no obligation to review it, or if the USDA did review the information, the USDA had no obligation to point out and object to the use of the Loan to refinance the interim loans, all of which is contradicted by the proof in the record and by the USDA's own regulations providing for objections to be raised and satisfied **prior** to the USDA's issuance of the Loan Guarantee;

h. it is contrary to law for the USDA to allow a Loan to be closed and issue a Loan Note Guarantee with knowledge of grounds for denial of a Loan Loss Claim and not assert such grounds until such claim is made, thus, negating the supposed "incontestability" of the USDA's guarantee provided by statute and contract, and making a mockery of the "full faith and credit" for obligations of the U.S. government;

17

i. the USDA ignored, failed to understand, or failed to consider the law cited by First Tennessee that under these circumstances, the USDA waived or was estopped from relying on the alleged unauthorized use of funds to refinance the interim loans which were used for the acquisition of the equipment contemplated by the Conditional Commitment;

j. the USDA either ignored, failed to understand, or failed to apply the correct standards and law in regard to its obligations pursuant to statute, caselaw and contract under the Loan Note Guarantee as to the incontestability of the Loan Note Guarantee. Even now, in its Answer to the Complaint, the USDA denies that the Loan Note Guarantee is incontestable;

k. the USDA either ignored, failed to understand, or failed to apply the correct standards and law and used circular reasoning to execute an end run around the incontestability of its Loan Note Guarantee, under the provisions of the statute and contract that the Loan Note Guarantee may be partially unenforceable "to the extent of any loss occasioned by . . . negligent servicing . . . ." The USDA asserted that: (1) "negligent servicing" included First Tennessee's predecessor's failure to discover and report the interim loan transactions prior to closing; (2) if the USDA had known about the interim loan transactions, it would never have approved the Loan; (3) the entire loss on the Loan was the result of the negligent servicing of First Tennessee's predecessor; and (4) the USDA could therefore deny the entire Loan Loss Claim. Relevant caselaw establishes that such a "but for" argument as made by the USDA cannot be allowed under a Loan Note Guarantee issued under the "incontestability" provisions;

l. the USDA failed to prove or present any evidence, and its Hearing Officer and Director failed to even consider whether any loss was caused or "occasioned by" any alleged negligence or other action of First Tennessee or its predecessor (other than "100% of the loss" argument stated above), and ignored First Tennessee's evidence, arguments and citation of legal authority as to causation (or lack thereof) of any loss attributable to any alleged negligent servicing by First Tennessee or its predecessor; and

18

m. the USDA asserted and applied improper legal authority in this matter, including certain caselaw applying stricter standards and burden of proof under SBA regulations, which are specifically distinguishable from the USDA regulations and caselaw interpreting them. Despite First Tennessee's pointing out these distinctions and statements within the same caselaw supporting such distinctions, the USDA, through its Hearing Officer and/or its Director, applied the more stringent standards and burden of proof, thus, requiring First Tennessee to have to prove verbatim compliance by its predecessor with the Conditional Commitment rather than the "substantial compliance" standard developed under the caselaw interpreting guarantees issued pursuant to the USDA's enabling statutes.

Plaintiff's motion (Docket Entry No. 17) for judgment on the record at 2-5.

## II. STANDARD OF REVIEW

A final determination by the National Appeals Division is reviewable by a United States district court of competent jurisdiction under the provisions of the Administrative Procedures Act. 7 U.S.C. § 6998. Under 5 U.S.C. § 706 of the APA, a "reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." In making its determination, the reviewing court shall . . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be-

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;

19

> (C) in excess of statutory jurisdiction,
> authority, or limitations, or short of
> statutory right;
> (D) without observance of procedure required
> by law;
> (E) unsupported by substantial evidence in a
> case . . . reviewed on the record of an agency
> hearing provided by the statute; or
> (F) unwarranted by the facts to the extent
> that the facts are subject to trial de novo by
> the reviewing court.

5 U.S.C. § 706(2). Judicial review shall be based on "the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." Id.

"A reviewing court reviews an agency's reasoning to determine whether it is 'arbitrary and capricious,' or, if bound up with a record-based factual conclusion, to determine whether it is supported by 'substantial evidence.'" Dickinson v. Zurko, 527 U.S. 150, 164 (1999). The "arbitrary and capricious" standard of review "is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983) (citation omitted); Michigan Bell Telephone Co. v. MCIMetro Access Transmission Servs., 323 F.3d 348, 355 (6th Cir. 2003) ("The arbitrary and capricious standard is the most deferential standard of judicial review of agency action,

20

upholding those outcomes supported by a reasoned explanation, based upon the evidence in the record as a whole.").

In reviewing the agency's explanation, the reviewing court must consider whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416(1971); <u>Kroger Co. v. Regional Airport Auth.</u>, 286 F.3d 382, 389 (6th Cir. 2002) ("Under the arbitrary or capricious standard, the party challenging the agency's action must 'show that the action had no rational basis or that it involved a clear and prejudicial violation of applicable statutes or regulations.'") (citation omitted).

An agency decision would normally be considered arbitrary and capricious if its decision was based on factors that Congress did not intend it to consider; if the agency entirely failed to consider an important aspect of the problem; or if the agency offered an explanation for its decision that ran counter to the evidence before the agency or was so implausible that it could not be ascribed to a difference in view or the product of agency expertise. <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 43. A reviewing court, in an attempt to remedy any such deficiencies, should not supply a reason for the agency's action in which the agency itself did not give. <u>Id</u>. A court will "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'"

21

Id. (citation omitted); Kroger 286 F.3d at 389 ("The arbitrary or capricious standard is the least demanding review of an administrative action. If there is any evidence to support the agency's decision, the agency's determination is not arbitrary or capricious."). "In reviewing agency action under the 'arbitrary and capricious' standard, the court should focus its review on 'the administrative record already in existence, not some new record made initially in the reviewing court.' Thus, the review should be 'based on the full administrative record that was before the [agency] at the time [it] made [its] decision.'" Davidson v. U.S. Dept. of Energy 838 F.2d 850, 855 (6th Cir. 1988) (citations omitted) (emphasis removed).

The Supreme Court "has described the APA court/agency 'substantial evidence' standard as requiring a court to ask whether a 'reasonable mind might accept' a particular evidentiary record as 'adequate to support a conclusion.'" Dickinson, 527 U.S. at 162 (citation omitted). "Substantial evidence review 'gives the agency the benefit of the doubt, since it requires not the degree of evidence which satisfies the court that the requisite fact exists, but merely the degree which could satisfy a reasonable factfinder.'" Wilson Air Center, LLC v. F.A.A. 372 F.3d 807, 813 (6th Cir. 2004) (citations omitted); Olenhouse v. Commodity Credit Corp. 42 F.3d 1560, 1581 (10th Cir. 1994) ("'Substantial evidence'" is more than a mere scintilla; it must be such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." Evidence is not substantial to the extent it is overwhelmed by other evidence, "or if the evidence constitutes mere conclusion.") (citations omitted). If an agency's decision is supported by substantial evidence, the agency's "determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." Bogle v. Sullivan, 998 F.2d 342, 347 (6th Cir. 1993) (citations omitted).

"These two provisions of 5 U.S.C. § 706(2) are part of six which are 'separate standards. . . .' [T]hough an agency's finding may be supported by substantial evidence . . . it may nonetheless reflect arbitrary and capricious action." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 284 (1974) (citations and footnote omitted). In Association of Data Processing Service Organizations, Inc. v. Board of Governors, 745 F.2d 677 (D.C.Cir. 1984), then Judge Scalia, writing for the Court, explained:

> [I]n their application to the requirement of factual support[,] the substantial evidence test and the arbitrary or capricious test are one and the same. The former is only a specific application of the latter, separately recited in the APA not to establish a more rigorous standard of factual support but to emphasize that in the case of formal proceedings the factual support must be found in the closed record as opposed to elsewhere.
>
> . . . .
>
> The "scope of review" provisions of the APA, 5 U.S.C. § 706(2), are cumulative. Thus, an agency action which is

supported by the required substantial evidence may in another regard be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"-for example, because it is an abrupt and unexplained departure from agency precedent. Paragraph (A) of subsection 706(2)-the "arbitrary or capricious" provision-is a catchall, picking up administrative misconduct not covered by the other more specific paragraphs. Thus, in those situations where paragraph (E) has no application (informal rulemaking, for example, which is not governed . . . to which paragraph (E) refers), paragraph (A) takes up the slack, so to speak, enabling the courts to strike down, as arbitrary, agency action that is devoid of needed factual support. When the arbitrary or capricious standard is performing that function of assuring factual support, there is no *substantive* difference between what it requires and what would be required by the substantial evidence test, since it is impossible to conceive of a "nonarbitrary" factual judgment supported only by evidence that is not substantial in the APA sense- i.e., not "'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn . . . is one of fact for the jury,'" <u>Illinois Central R.R. v. Norfolk & Western Ry.</u>, 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162 (1966) (quoting <u>NLRB v. Columbian Enameling & Stamping Co.</u>, 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939)). We have noted on several occasions that the distinction between the substantial evidence test and the arbitrary or capricious test is "largely semantic . . . ."

<u>Id</u>. at 683-84 (emphasis in original) (citations and footnote omitted).

A district court reviews questions of law <u>de novo</u>. <u>Kratt v. Garvey</u>, 342 F.3d 475, 480 (6th Cir. 2003); <u>New West Materials, LLC v. Interior Bd. Of Land Appeals</u>, 398 F. Supp.2d 438, 443 (E.D. Va. 2005).

Case 1:05-cv-00027   Document 24   Filed 03/31/08   Page 24 of 57 PageID #: 131

## III. CONCLUSIONS OF LAW

The regulations governing the making and servicing of B&I loans guaranteed by the RBCS are found at Part 4279, Subparts A and B, and Part 4287, Subpart B, of Title 7 of the Code of Federal Regulations. Section 4279.1(b) provides, "It is the responsibility of the lender to ascertain that all requirements for making, securing, servicing, and collecting the loan are complied with." The lender is responsible for servicing the entire loan, 7 C.F.R. § 4287.101(b), and "for taking all servicing actions that a prudent lender would perform in servicing its own portfolio of loans that are not guaranteed." 7 C.F.R. §4287.107. Section 4279.30(a)(1) states that the lender's primary responsibility is the successful delivery of the B&I loan program. Any lender obtaining or requesting a B&I loan guarantee is responsible for, *inter alia*, processing applications for guaranteed loans, developing and maintaining adequately documented loan files, recommending only loan proposals that are eligible and financially feasible, obtaining valid evidence of debt and collateral in accordance with sound lending practices, distributing loan funds, servicing and liquidating guaranteed loans in a prudent manner, following Agency regulations, and obtaining Agency approvals or concurrence as required. *Id*. The lender is also responsible for conducting loan closings. *Id*., § 4279.30(d).

25

The lender is further primarily responsible for determining credit quality of the borrower, including adequacy of equity. New businesses are required to maintain a minimum of twenty percent (20%) tangible balance sheet equity at the time the Loan Note Guarantee is issued. 7 C.F.R. § 4279.131(d). Section 4279.161(b)(16) requires the lender to certify that "it has completed a comprehensive analysis of the proposal, the applicant is eligible, the loan is for authorized purposes, and there is reasonable assurance of repayment ability based on the borrower's history, projections and equity, and the collateral to be obtained." With respect to interim financing, § 4279.113(r)[5] provides that "[g]uaranteeing a loan after project completion to pay off a lender's interim loan will not be treated as debt refinancing provided that the lender submits a complete preapplication or application which proposes such interim financing prior to completing the interim loan." This provision warns that the Agency assumes no responsibility or obligation for interim loans advanced prior to the Conditional Commitment is issued. Id.

The Conditional Commitment is the Agency's notice to the lender that the loan guarantee it has requested is approved subject to the completion of all conditions and requirements set forth by the Agency. Id., § 4279.2; 4279.173(a). The Loan Note Guarantee will not be issued until the lender certifies, inter alia, that no

_____

[5]This provision is now codified as § 4279.113(s).

major changes have been made in the lender's loan conditions and requirements since the issuance of the Conditional Commitment, unless such changes have been approved by the Agency. Id., 4279.181(a). "The Loan Note Guarantee is unenforceable by the lender to the extent any loss is occasioned by . . . use of loan funds for unauthorized purposes, negligent servicing, or failure to obtain the required security interest regardless of the time at which the Agency acquires knowledge of the foregoing." 7 C.F.R. § 4287.107.

Section 4279.72(a) provides in pertinent part:

A guarantee under this part constitutes an obligation supported by the full faith and credit of the United States and is incontestable except for fraud or misrepresentation of which a lender or holder has actual knowledge at the time it becomes such lender or holder or which a lender or holder participates in or condones. . . . [T]he guarantee will be unenforceable by the lender to the extent any loss is occasioned by . . . negligent servicing or failure to obtain the required security regardless of the time at which the Agency acquires knowledge thereof. Any losses occasioned will be unenforceable to the extent that loan funds are used for purposes other than those specifically approved by the Agency in its Conditional Commitment.

Id. Negligent servicing is defined as:

The failure to perform those services which a reasonably prudent lender would perform in servicing (including liquidation of) its own portfolio of loans that are not guaranteed. The term includes not only the concept of a failure to act, but also not acting in a timely manner, or acting in a manner contrary to the manner in which a reasonably prudent lender would act.

Id., § 4279.2.

"It is well settled that '[a] government agency's regulations that have been published in the Code of Federal Regulations have the force and effect of law.'" First Tennessee Bank Nat. Ass'n v. Barreto, 268 F.3d 319, 329 (6th Cir. 2001) (internal quotes and citations omitted). Moreover, the parties' incorporation of the regulations by reference in the guaranty agreement governs their relationship. Id. at 331.

The Secretary asserts that the issue here stems from PUB's uncritical acceptance of MMF's materially misleading original loan application and PUB's subsequent blind and reckless disbursement of loan proceeds. In the Secretary's view, PUB failed to make and service the loan as a prudent lender should. The Secretary contends that MMF's loan application showed that it had $497,629 in fixed assets, which it falsely claimed to own free and clear of all liens. In fact if PUB had conducted a routine Uniform Commercial Code-1 search, PUB would have discovered financial statements from March 11 and April 20, 1998, revealing two liens held by LTI on MMF's equipment in the amount of $335,000. The Secretary argues that PUB's failure to assure that the collateral was unencumbered was a material breach under the Conditional Commitment and the fact that a security interest in the equipment may have been obtained sometime after closing is inconsequential.

PUB certified that the B&I loan was to be used for the purchase of new equipment and to refinance $47,500 in debt.

28

However, the Secretary asserts that MMF improperly used loan proceeds in excess of $710,000 to pay off the bridge loans used to purchase or lease the equipment from LTI, which was contrary to the stated purpose of the loan as presented to the USDA. In the Secretary's view the use of loan proceeds constituted a material breach of the loan application's terms; therefore, PUB did not substantially comply with its obligations under USDA regulations, which require that no adverse changes occur between the time the USDA issued the Conditional Commitment and the time it issued the Loan Note Guarantee regardless of whether the changes or causes thereof were within the lender's or borrower's control. The defendant asserts that under the regulations it is not the USDA's responsibility to conduct or make a review of the loan closing. That responsibility lies solely with the lender. Thus, any loss is therefore attributed to the party, i.e., the lender, who is in the better position to prevent the loss.

Lastly, the Secretary contends that it did not contest the guarantee as an obligation of the United States but instead it denied FTB's loan loss claim based on PUB's negligent servicing of the loan. The Secretary contends that PUB was in a better position to prevent the loss and would have done so if it had not been negligent in performing its duties as a prudent lender. Further, the Secretary insists that PUB knowingly allowed MMF to use the loan proceeds for purposes other than those approved of in the loan

29

application or Conditional Commitment. The Secretary argues that FTB, as successor in interest, assumed all of PUB's original liabilities and is, thus, responsible for PUB's negligent servicing of the loan.

FTB's thirteen contentions set forth in its motion, <u>see</u> (Docket Entry No. 17) for judgment on the record at 2-5, are elaborated upon and condensed into ten headings of contention in its memorandum (Docket Entry No. 18) of law. The Court will address each contention in turn.

### A. SUBSTANTIAL COMPLIANCE

FTB asserts that although the record shows that MMF used bridge or interim loans to acquire new equipment anticipated by the B&I loan, those bridge loans were subsequently satisfied out of the proceeds at the loan closing and PUB obtained the collateral intended and required by the USDA, including a first priority security interest on the new equipment acquired. Therefore, FTB contends that this constituted substantial compliance. In support of its contention, FTB relies on <u>Eastern Illinois Trust & Savings Bank v. Sanders</u>, 826 F.2d 615 (7th Cir. 1987).

In <u>Sanders</u>, the plaintiff sued the Small Business Administration for the SBA's refusal to honor its agreement to purchase from the plaintiff 90% of three SBA-guaranteed loans that had lapsed into default. 826 F.2d at 615. SBA regulations placed a cap on the interest rate that a participating bank could charge

30

for a guaranteed loan, and the guaranty agreement, executed by the plaintiff bank and the SBA and incorporated in each of the four loans made to the plaintiff, prohibited the plaintiff from charging any fees or commissions in connection with the loan, unless it was paid for actual services rendered. Id. at 616. SBA regulations required that any fees or commissions accepted as payment for services rendered had to be disclosed to the SBA. Id. In each of the four loans, the plaintiff made a secondary loan to the borrower, which it did not disclose to the SBA and resulted in interest payments higher than those prescribed by the guaranty agreement. The issue in Sanders was, despite the fact that the side loans violated the terms of the guaranty agreement, whether the plaintiff's conduct in connection with the four loans constituted substantial compliance with SBA requirements so that the SBA was required to honor its guaranty obligations. Id. The Seventh Circuit affirmed the lower courts's finding that the lender did not materially breach the guaranty agreement.

This Court finds that the plaintiff's reliance on Sanders in support of its argument for substantial compliance is misplaced. In Sanders a specific provision of the regulations, 13 C.F.R. § 120.202-5, dealt with the SBA being able to refuse to purchase its share of a guaranteed loan in cases where a participating bank had not "substantially complied" with SBA requirements. Id. at 616. Also, in reaching its decision, the Seventh Circuit noted that one

31

of the prerequisites to repudiating a guaranty outlined by the SBA's internal procedural standards was a substantial failure of compliance. _Id_. at 617. However, unlike the SBA regulations in _Sanders_, 4279-A, 4279-B, and 4287-B do not specifically contemplate the concept of "substantial compliance" in the provisions governing the administration of B&I loans by the RBCS. There is no mention of that phrase in these regulations. The provisions only provide what is required of the lender in making, securing, servicing, and collecting the loan.

FTB previously presented the same argument regarding the issue of substantial compliance, and it was rejected by the Agency. In its Post Hearing Responsive Statement, the USDA cited _Barreto_, 268 F.3d 319, as being the most relevant to the case at bar. (Docket Entry No. 11, Certified transcript, Volume II at 905). In _Barreto_ the plaintiff filed suit against the SBA to fulfill its obligation under the guaranty agreement to repurchase a defaulted loan. The Sixth Circuit specifically refused to follow _Sanders_ finding that the SBA standard operating procedure at issue in that case was different from the one at issue before the Court in _Barreto_. 268 F.3d at 338; Volume II at 906. The Court found that the lender materially breached its loan guaranty agreement because the lender failed to act in a prudent manner by failing to review documents submitted by the borrower to obtain payment on a letter of credit. Also, upon learning from the borrower that the letter of credit had

32

been dishonored, the lender relied solely on the borrower to obtain payment from the foreign bank issuing the letter instead of referring the matter to the lender's international banking department or taking any other steps to assist the borrower, even after payment on the letter of credit was denied a second time. Id. at 338-340. The Court held that the lender had the burden of making a threshold showing that it had serviced the guaranteed loan in a commercially reasonable manner and affirmed the finding that the lender was substantially negligent in servicing the loan so as to relieve the SBA of its obligation to repurchase the loan. Id. at 330, 336-40; Volume II at 906.

Here in FTB's appeal to the Deputy Director, he found the following:

> Magna's loan application showed it had fixed assets of $497,629. Title to these assets was represented to be free and clear of all liens. This was not true. A financial statement of March 11, 1998 showed that LTI held a $150,000 first lien on all of Magna's equipment, which was the same equipment listed as fixed assets on the Application for Loan Guarantee. A second financial statement of April 20, 1998 showed an additional $185,000 first lien on equipment purchased by Magna. Magna failed to disclose this lien; it did not have clear title to the fixed assets. This is a significant and substantial deviation from [First Tennessee's] commitments in the loan guarantee documents because it meant that the loan was not secured in the manner promised by those documents. PUB was obligated to review publicly available documents to assure that Magna's loans were properly collateralized. PUB would have discovered these facts had it conducted a routine review of collateral required of a prudent lender. That a proper security interest was obtained sometime after closing does not change the fact that PUB's failure was a material breach

33

of its obligations under the conditional and commitment and the regulations.

The purpose of Magna's loan, as identified in its loan application, was to purchase new equipment and to refinance $47,500 of existing debt. PUB certified on March 27, 1998 that the loan was to be used as stated on the loan application. However, by the time the loan was closed, much equipment had already been purchased or leased, and loans in excess of $710,000 were paid off at closing, contrary to the stated purpose of the loan. At least $710,000 of the loan proceeds were used for unauthorized purposes. This is also a significant and substantial deviation from the loan terms and does not substantially comply with [First Tennessee's] obligations under the RBCS regulations.

(Docket Entry No. 11, Certified transcript, Volume II at 925).

In sum, FTB's position on substantial compliance is unsupported by the relevant statutes and regulations and case authority. The Court concludes that the USDA's decision on this issue is neither arbitrary nor capricious nor an abuse of discretion, or otherwise not in accordance with law or unsupported by substantial evidence. The Secretary's decision on this issue is within the USDA's statutory authority or limitations. Accordingly, this contention lacks merit.

B. IMPROPER BURDEN OF PROOF UNDER AUTHORITY CITED BY USDA[6]

FTB contends that the USDA relied upon improper legal authority, which applied stricter standards and imposed a higher burden of proof under SBA regulations that are specifically

_____

[6]Although this contention is an extension of the issue of substantial compliance, the Court will address it separately because the plaintiff presented it this way in its brief. See plaintiff's memorandum (Docket Entry No. 18) at 28-29.

34

distinguishable from USDA regulations and caselaw interpreting them. As a result, FTB asserts that the Secretary required proof of precise compliance by PUB with the Conditional Commitment rather than the "substantial compliance" standard. FTB contends that the USDA erroneously relied on Barreto to assert a greater burden of proof than that required by 7 C.F.R. § 11.8(e).[7] FTB contends that the USDA's reliance on the Barreto case was misplaced because Barreto involved the more stringent requirement of the regulations governing SBA loans. FTB asserts that in Barreto the SBA's obligation on the Guarantee did not even arise unless the lender first established performance under the contract and stated that the SBA would be released from the obligation unless the lender first proved substantial compliance with all regulations and loan documents. FTB cites Brunswick Bank & Trust Co. v. United States, 707 F.2d 1355 (Fed. Cir. 1983), which addressed a FmHA Guarantee that involved an incontestability clause under the same enabling statutes and similar regulations as here, where the Court imposed a lesser burden of proof than that imposed under the more stringent regulations in Barreto.

In Brunswick Bank, the lender sued for reimbursement under the terms of a guaranty given by the Farmers Home Administration. 707 F.2d at 1356. The FmHA refused to honor the guaranty because of

---

[7]That section provides that "[t]he appellant has the burden of proving that the adverse decision of the agency was erroneous by a preponderance of the evidence."

the lender's negligence in servicing the loan.  Id. at 1357.  The Lender's Agreement provided that the obligation of guaranty by the government was "'supported by the full faith and credit of the United States and [was] incontestable except for fraud or misrepresentation of which the Lender has actual knowledge . . . [,] [and is] unenforceable by the Lender to the extent of any loss occasioned by . . . use of loan funds for unauthorized purposes, negligent servicing, or failure to obtain the required security . . . .'"  Id. at 1360.  The Federal Circuit held that the Lender's Agreement provided the government with an affirmative defense, namely negligent servicing.  Therefore, FmHA bore the burden of proof in proving that the lender negligently serviced the loan. Id. at 1360-61.

Despite allocating the burden of proof to the government, the Court found that the bank negligently serviced the loan.  Id.  at 1361.  The Court noted that the loan servicing responsibility of the bank extended to all pre-default actions.  Id. at 1362. Specifically, the bank failed to confirm that proper hazard insurance was obtained, the bank was negligent in monitoring the use of loan funds and the bank was negligent in overseeing the modernization of borrower's plant.  Id.  The Court concluded that the evidence clearly indicated that the bank disregarded many of its most basic servicing obligations.  Id. at 1363.

36

Here, the Deputy Director found the plaintiff's argument on this issue to be conclusory and a summation of its earlier argument. Certified transcript (Docket Entry No. 11) Volume II at 932. He reiterated that PUB failed to comply with the B&I loan regulations that required it properly to make, secure, and service the loan, as it would reasonably do in servicing its own loan portfolio.

The Court finds the Agency's decision to be well taken for the reasons stated in the previous section dealing with substantial compliance.

### C. USDA'S AWARENESS OF THE INTERIM LOANS & REFINANCING

FTB disputes the USDA's assertion that it was unaware of the refinancing of the interim loans before it issued its Loan Note Guarantee and that it would not have issued the loan had it known. FTB contends that the USDA representatives were timely advised of the interim refinancing on or about the date of the loan closing in June 1998, or otherwise fully informed within days after closing by delivery of the loan settlement statement showing the disbursement of funds. Further, the USDA had this information in its possession for over two months before issuing the loan Note Guarantee. FTB contends that because the USDA could have refused to execute the Loan Note Guarantee for failure to comply with conditions and requirements approved for the loan, the USDA cannot now assert that it would not have issued its Loan Guarantee "but for" its lack of

37

knowledge of the refinancing. To support this contention, FTB relies on the testimony of Beavers to establish the USDA's policy of waiving the restriction against debt refinancing and to discredit Beasley's self-serving statements.

The Deputy Director did not find Beavers' testimony to refute clearly the USDA's statement that it would not have issued the loan had it had knowledge of the refinancing as presented by the plaintiff. Id. at 926. The Deputy Director stated:

> I am not persuaded by Suzanne Beavers' testimony. The fact remains that there is no documentary evidence that RBCS knew of the bridge loans prior to loan closing. Had [First Tennessee's] predecessor complied with the regulations and sought a waiver, it would have such documentation. In addition, Ms. Beavers is a relatively low-level specialist and loan processor who does not have the authority to bind RBCS or to change or modify RBCS regulations. Her belief as to RBCS's policy at the time may explain why she overlooked the clear evidence that [First Tennessee's] predecessor had permitted improper use of the loan proceeds, but these beliefs do not excuse [First Tennessee's] predecessor's failure to fulfill its obligations. The fact remains that [First Tennessee's] predecessor did not ensure that loan proceeds were only used for proper purposes and did not seek a waiver, thereby violating its obligations under the terms of the conditional commitment and the applicable regulations. I therefore reject [First Tennessee's] contentions that RBCS was somehow complicit in [First Tennessee's] predecessor's regulatory violations in a way that excused those violations.

Id.

The Court agrees with the reasoning articulated by the Deputy Director. The record does not support FTB's contention that the USDA definitively knew about the bridge loans prior to closing. The Conditional Commitment provided that only $47,500 of the funds

38

from the B&I loan were to be used toward debt refinancing. PUB did not seek a waiver from RBCS. The lender has the ultimate responsibility to make sure that all the requirements with making, securing and servicing the loan are complied. 7 C.F.R. §§ 4279.1(b); 4279.30(a), (d); and 4279.181.

Accordingly, FTB's contention is without merit.

### D. WAIVER AND ESTOPPEL

FTB next contends that the USDA was aware that funds were used to refinance the bridge loans, but failed to advise PUB of any problem with the loan closing and allow PUB to take action to satisfy the USDA. Moreover, FTB cites the USDA's lack of action such as refusing to issue or object to the Loan Note Guarantee. As a result, FTB asserts it was not on notice or otherwise advised of any contest or issues involving the validity or enforceability of the Loan Note Guarantee. Therefore, the USDA's actions or failure to act constitutes either waiver and/or estoppel.

The plaintiff cites to Colorado State Bank of Walsh v. United States, 18 Cl.Ct. 611, 632 (U.S. Claims Ct. 1989) as providing the elements needed to estop the United States in an appropriate case from denying the existence of a contractual agreement. These elements are:

> (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true fact; and (4) he must rely on the former's conduct to his injury.

39

Id. FTB asserts that the USDA's position is that although it had information in its possession that indicated that verbatim compliance with the Conditional Commitment had not been achieved, it could issue the Loan Note Guarantee and allow the plaintiff to undertake collection of the loan. However, the USDA would then hold in reserve the defense that because PUB did not precisely comply with the requirements, the loan should not have been made and therefore it does not have to honor the Loan Note Guarantee.

The Deputy Director concluded that there was neither anything in the regulations nor did the plaintiff cite a specific regulation or law supporting its assertion that the RBCS failed to comply with its regulations. (Docket Entry No. 11, Certified transcript, Volume II at 927). The Deputy Director found that the RBCS was not legally obligated to ensure the accuracy of MMF's application or the supporting documentation and that FTB was improperly trying to shift its responsibility to the RBCS. Id.

In reaching his conclusion that lenders are responsible for compliance with the applicable regulations, the Deputy Director relied on 7 C.F.R. §§ 4279.1(b) and -.30(a)(1), (d). Section 4279.1(b) provides that the lender has the responsibility to ascertain that all requirements for making, securing, servicing and collecting the loan. Section 4279.30(a)(1) states that the lender has the primary responsibility of the successful delivery of the B&I loan program, including processing applications for guaranteed

40

loans, developing and maintaining adequately documented loan files, recommending only loan proposals that are eligible and financially feasible, obtaining valid evidence of debt and collateral in accordance with sound lending practices, distributing loan funds, servicing and liquidating guaranteed loans in a prudent manner, following Agency regulations, and obtaining Agency approvals or concurrence as required. According to § 4279.30(d), the lender is responsible for conducting loan closings.

The Deputy Director noted that there are specific regulations governing the conditions under which the RBCS will grant a waiver of regulatory requirements but that PUB did not avail itself of these regulations. For instance, § 4279.173(b) provides that "[i]f certain conditions of the conditional Commitment cannot be met, the lender and applicant may propose alternate conditions." Further, he stated that it was undisputed that PUB did not seek any type of waiver and that it is purely speculative for the plaintiff to assert what the RBCS would have done had it sought a waiver.

Lastly, the Deputy Director concluded that estoppel does not lie against the federal government where a federal employee engaged in some affirmative action upon which the plaintiff relied. See Office of Personnel Mgmt. v. Richmond, 496 U.S. 414, 419-24 (1990) (recognizing that the Court's position has historically been for equitable estoppel not to lie against the federal government as it lies against private litigants and while not closing the

41

possibility of applying it against the government under certain circumstances, the Court decided to "leave for another day whether an estoppel claim could ever succeed against the Government."); Federal Crop Ins. Corporation v. Merrill, 332 U.S. 380 (1947); see also Colorado State Bank of Walsh, 18 Cl.Ct. at 632 ("It is well established that estoppel cannot be applied against the Government on account of unauthorized statements or acts of an officer or employee who is without authority.").

The Court agrees with the above rationale. Accordingly, FTB's contentions on these issues are without merit.

### E. USDA POSITION ON MMF'S EQUITY REQUIREMENT

FTB next asserts that the essence of the USDA's rationale for denying its loan loss claim was that MMF allegedly misrepresented its ownership of the existing equipment valued at $497,000 and that if MMF did not own that equipment, it could not have met the equity requirement. FTB contends that the USDA's calculation was erroneous and that MMF had met the equity requirement at all times. In FTB's view, despite the Deputy Director's vacating the 20% tangible balance sheet equity requirement as a basis for supporting the adverse decision, the Deputy Director continued to rely on the alleged misrepresentation by MMF of the ownership of the existing equipment and the USDA would not have made the loan had it known of MMF's misrepresentation. FTB, however, contends that the only reason the alleged misrepresentation of ownership of the equipment

42

was material was because the USDA believed that MMF had not met its 20% tangible balance sheet equity requirement.

The Court disagrees. MMF misrepresented that it owned the equipment unencumbered and did not advise the RBCS of the interim financing in contravention of the agreement. As stated previously, FTB's contention that the RBCS would have waived any objection to the interim financing is mere conjecture. The responsibility lay in the lender's hands to protect itself by apprising the RBCS of the interim financing, thereby establishing a record on which it could rely for support. This, PUB failed to do. The Court concludes that the Deputy Director's decision is not shown to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of the USDA's statutory authority or limitations; or unsupported by substantial evidence. Accordingly, this claim fails.

### F. NO MISREPRESENTATION OF OWNERSHIP OF ASSETS

FTB next contends that the USDA has consistently failed to recognize that MMF's transaction with LTI was not a true sale and lease of equipment, but rather was a secured transaction perfected by an UCC-1 financing statement. For this contention, FTB cites that (1) MMF owned equipment valued at $497,000 and unencumbered at the end of 1997 and as late as February 28, 1998, and although it entered into a transaction termed a "sale-leaseback" with LTI, the equipment never left MMF's possession; (2) MMF acquired new and

43

additional equipment with the proceeds of this loan transaction; and (3) all such equipment was released when the loan was paid off out of the B&I loan closing. FTB contends that despite the use of the term "lease" in the transactions with LTI, these were, in reality, secured transactions whereby a security interest was granted in the equipment owned by MMF. According to FTB, MMF's assets were not depleted and the same assets became collateral for the B&I loan along with the additional new equipment MMF acquired with the money from LTI. FTB also contends that no loss was occasioned by this transaction, and even if it constituted a misrepresentation by MMF, it was not a material misrepresentation.

The Court disagrees with the plaintiff's assessment. Regardless of the terminology employed to describe the transaction between MMF and LTI, the Deputy Director made clear that part of the reason for denying FTB's claim was that MMF misrepresented that it held assets free and clear of any liens. Financial statements revealed that LTI held two liens on MMF's equipment in the amount of $335,000. Therefore, MMF did not have clear title to the fixed assets as represented in the agreement. Accordingly, the plaintiff's contention on this issue is without merit.

### G. GUARANTEE INCONTESTABLE

In accordance with 7 U.S.C. § 1928(b), the Loan Note Guarantee provides that any USDA guaranty "is incontestable except for fraud or misrepresentation of which Lender or any Holder has actual

44

knowledge at the time it became such Lender or Holder or which Lender or any Holder participates in or condones." (Docket Entry No. 11, Certified transcript, Volume I at 16). FTB asserts that the Secretary originally conceded in its Answer (Docket Entry No. 8) that the loan note guarantee was incontestable, but that the Secretary now takes the position that the loan note was not incontestable. Id., ¶ 5. However, in his brief the Secretary states that he does not contest the guarantee as an obligation of the United States. Defendant's memorandum (Docket Entry No. 19) at 16. Accordingly, this claim is moot.

### H. NEGLIGENT SERVICING OR NEGLIGENT MISREPRESENTATION

Under the terms of the Loan Note Guarantee and 7 C.F.R. §4279.72(a),

> [T]he Loan Note Guarantee will be unenforceable by Lender to the extent any loss is occasioned by . . . negligent servicing . . . regardless of the time at which USDA acquires knowledge of the foregoing. Any losses occasioned will be unenforceable to the extent that loan funds are used for purposes other than those specifically approved by USDA in its Conditional Commitment for Guarantee. Negligent servicing is defined as the failure to perform those services which a reasonably prudent lender would perform in servicing (including liquidation) its own portfolio of loans that are not guaranteed. The term includes not only the concept of a failure to act but also not acting in a timely manner or acting in a manner contrary to the manner in which a reasonably prudent lender would act up to the time of loan maturity or until a final loss is paid.

Certified transcript (Docket Entry No. 11) Volume I at 16. FTB contends that the term "negligent servicing" does not apply to the lender's alleged failure to discover the details of the

45

transactions between LTI and MMF and the failure to report such information to the USDA.

To determine what constitutes "negligent servicing," FTB submits the Court should look first to 7 U.S.C. § 1981f for guidance. Section 1981f states that the Secretary "shall, to the extent practicable, use underwriting forms, standards, practices, and terminology similar to the forms, standards, practices, and terminology used by lenders in the private sector." FTB contends that in its common usage, "servicing" connotes action with regard to a loan <u>after</u> it has been closed and put on the lender's books. The plaintiff, however, has not adduced any authority to establish that the standard practice and usage of "servicing" is in regard to a loan after it has closed.

In support of its contention, FTB cites <u>Brunswick Bank</u>, 707 F.2d 1355, where the Court stated, "The loan servicing responsibility of the bank extended not only to debt liquidation, but also to all pre-default actions that were 'necessary after loan closing to collect the indebtedness and to protect the security and security rights.'" <u>Id</u>. at 1362 (citation omitted). However, FTB's reliance on this one statement must be considered in context. In <u>Brunswick Bank</u>, the negligent actions of the bank directly resulted in the loss and occurred after the loan had closed. Therefore, the Court's statement was in reference to the time in which the negligence took place and not a general rule. Further, absent

46

other evidence or legal authority to establish this common usage or understanding of this term, this Court cannot conclude that the Agency's actions were arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and is not supported by substantial evidence as the plaintiff submits. Accordingly, this claim is without merit.

## I. NO MATERIAL BREACH OF THE GUARANTEE TERMS

FTB next contends that the guarantor cannot escape its loan guarantee obligation despite violations of the terms of the guaranteed loan documents by the lender, where the violations (including failure to advise the government of additional loans) did not constitute a material breach of the guarantee contract allowing nonperformance by the guarantor. In support the plaintiff relies on Sanders, 826 F.2d 615.

In Sanders it was undisputed that the lender violated the loan agreement when it charged side loans to borrowers, which enabled the lender to charge borrowers higher interest rates than the guaranty agreements permitted. However, the lower court found that this violation was not so material as to release the SBA from its obligation to honor the guaranties or so material as to require the lender to disgorge the guaranty funds it already received. Eastern Illinois Trust & Savings Banks v. Sanders, 631 F. Supp. 1393, 1395, 1398 (N.D. Ill. 1986). In its decision, the district court noted that a contractual relationship between a government agency and a

47

private party is qualitatively different than between two private parties.  It stated:

> The question . . . is whether the breach was so material as to release the SBA from the obligation to honor its guaranties and so material as to require that Eastern disgorge the guaranty funds it has already received for the . . . loan. . . .  At the close of testimony, . . . this court remained troubled by the unusual context of this case and the impact that context should have upon this court's materiality analysis.  A contractual relation between a federal governmental agency such as the SBA and a private party is qualitatively different from a contractual relation between two private parties. Materiality of breach between private parties basically involves questions of causation and damage.  Materiality of breach with regard to a federal agency raises the issue of how the courts are to deal with breaches of trust which have the potential to impact negatively on the overall success of important governmental programs, such as the guaranteed loan program.  A single breach of trust may have little or no financial impact on the SBA but so undercut the regulatory objectives of a program that the damage caused by the breach is far out of proportion to the damage generally contemplated as the potential risk of a single financial transaction.  In the materiality analysis applicable to this case, therefore, the concept of non-financial harm to the SBA must play a role.

Id. at 1395-96.

The court then articulated four factors which should be considered in determining whether a breach is material.  They are:

> (1) whether the breach operated to defeat the bargained-for objective of the parties; (2) whether breach caused disproportionate prejudice to the non-breaching party; (3) whether custom and usage considers such a breach to be material; and (4) whether the allowance of reciprocal non-performance will result in the accrual of an unreasonable and unfair advantage.

Id. at 1396.

48

The court found that the side loans did not operate to defeat the bargained-for objective of the parties, which was providing capital to small businesses on reasonable terms, and the breach did not cause disproportionate prejudice to the SBA because the side loans neither diminished the initial flow of funds to the borrower, nor did they negatively impact the borrower's ability to repay the loan. Id. The court considered the SBA's historical responses to various breaches of guaranty agreements and noted that in similar situations the SBA did not impose sanctions as severe as the ones imposed in that case. Id. at 1397. Further, the court found that the clause at issue in the guaranty agreement did not provide for the possibility of denial and the SBA could not therefore deny the loan after the fact, as the risk of loan denial for such a transgression was clearly not contemplated by the parties. To do so would result in the accrual of an unreasonable or unfair advantage to the SBA. Id. Lastly, the court stated that the "SBA's claim that 'but for' the misrepresentation it would not have guaranteed the[] loans [was] unconvincing. An immaterial misrepresentation [was] not of itself sufficient to void the guaranty agreement." Id. at 1398.

Here, FTB asserts that the interim financing and transactions with LTI neither interfered with the objectives of providing B&I loans nor did it cause disproportionate financial prejudice to the USDA because PUB obtained all of the collateral that was required

49

of it.  The plaintiff further asserts that the interim financing
was consistent with the USDA's practice and policy to waive the
refinancing requirements and according to Ms. Beavers, the USDA's
representative, that if the lender had a first priority security
interest on the collateral the refinancing could not then be a
basis for denial of the loss claim.  Finally, the plaintiff asserts
that if the interim financing is used as the basis to allow the
USDA to deny the Loss Claim at this point, especially after the
substitute lender has come in with no notice of any problems, it
would result in the accrual of an unreasonable and unfair advantage
to the USDA.

The Court disagrees.  Although FTB asserts that the USDA did
not experience any financial hardship, as noted by the district
court in Sanders, a breach of trust is considered serious even if
it is not characterized as financial, where the breach has the
potential to impact negatively on the overall success of important
governmental programs.  See id. at 1395-96.  Also, the result in
Sanders is inapplicable to the facts in this case because in
Sanders the SOP, which set forth the standards used by the SBA in
determining whether to deny a loan guaranty, contemplated a
substantial failure of compliance by the lender.  Id. at 1396.
FTB's claim regarding substantial compliance was previously
discussed and discounted by this Court.  Moreover, the particular

50

clause in the guaranty agreement in <u>Sanders</u> did not provide for the possibility of denial unlike other clauses in the agreement.

Further, FTB's assertion that it was the USDA's practice and policy to waive refinancing requirements is not supported by the record. Moreover, FTB's characterization of Beavers as being "the USDA's representative" appears from the record to be exaggerated, and the record does not support that she had authority to bind or establish USDA policy. FTB's last assertion is irrelevant with respect to FTB being a substitute lender because as a substitute lender the new lender steps in place of the original lender's shoes and assumes all original loan requirements, including the original lender's liabilities and servicing responsibilities. 7 C.F.R. § 4287.135(a)(iii).

Accordingly, the Court finds that the violations were a material breach of the loan guarantee.

J.  EXTENT OF LOSS OCCASIONED BY ALLEGEDLY NEGLIGENT CONDUCT

The "Conditions of Guarantee" of the Loan Note Guarantee provides, in relevant part, as follows: "[T]he Loan Note Guarantee will be unenforceable by Lender to the extent any loss is occasioned by . . . negligent servicing . . . . Any losses occasioned will be unenforceable to the extent that loan funds are used for purposes other than those specifically approved by USDA in its Conditional Commitment for Guarantee." (Docket Entry No. 11, Certified transcript, Volume I at 16). FTB contends that the USDA

51

failed to prove that "any loss" was "the result" of any alleged negligent misrepresentation or servicing. FTB asserts that the record shows that MMF operated for several years after the loan was made and ultimately that it failed, not because of its equity at the time of the loan closing, but because it subsequently lost its two (2) largest contracts due to the failure of those businesses. FTB contends that although the Agency asserted that penalties were paid on several of the interim loans, it only indicated that $65,000 should not have been incurred. Therefore, since the hearing officer concluded that such penalties were the result of negligent servicing by the lender, then the "extent of loss" should only have been $65,000 and not the disallowance of the entire Loan Loss Claim.

FTB cites the phrase, "to the extent any loss is occasioned by . . . negligent servicing," as limiting the USDA's ability to deny its loss claim to the amount the USDA can show was actually <u>caused by</u> the allegedly negligent conduct. FTB asserts that there is no proof that any loss in any amount was caused by the lender's conduct. According to FTB, neither the hearing officer nor the Deputy Director made any discernable findings on the extent of loss occasioned by negligent servicing except to conclude that all of the loss was occasioned by it because the USDA would not have made the loan "but for" the alleged negligent servicing.

52

The Deputy Director's decision does not directly address this specific contention made by the plaintiff; therefore, the Court will examine the hearing officer's ruling. The hearing officer stated, in part:

> It is telling that the business paid substantial pre-payment penalties on the interim loans. OIG Special Agent Julie McMillan mentioned in her investigation report that "unexpected fees" were paid by the business on the prepayment of these interim loans. In her hearing statement she indicated these amounts were approximately $65,000 in pre-payment penalties. It is clear from this fact that the loans were not interim loans, but more long-term in nature.
>
> In fact, significant pre-payment penalties would not normally be associated with interim loans, since they are specifically intended by design to be short in duration and are expected to be repaid very quickly. It is the agency's opinion that these pre-payment fees contributed to the downfall of the business. This is substantiated by the testimony of Magna General Manager Al Nother given to OIG that the business did not borrow enough money in the beginning and had to pay "unexpected fees associated with the interim loans." The business was short of cash from the beginning, which was compounded by the fact that pre-payment penalties were paid on the interim loans, further depleting the available operating cash of the business.

Id., Vol. II at 901. The hearing officer concluded:

> [P]re-payment penalties associated with the supposed interim loans contributed to the downfall of the business and subsequent loss claim. As such, the lender's actions must be considered negligent. This is substantiated by the agency record and facts brought forth in the hearing. As stated in the Lender's Agreement, **"Any losses will be unenforceable by the Lender to the extent that loan funds are used for purposes other than those specifically approved by USDA in its Conditional Commitment for Guarantee."** In addition, the Loan Note Guarantee states, **"the Loan Note Guarantee will be unenforceable by the Lender to the extent any loss is occasioned by the violation of usury laws, negligent servicing, or failure**

53

> to obtain the required security regardless of the time at
> which USDA acquires knowledge of the foregoing."

Id. (emphasis in original).

FTB contends that if the financing costs of the interim loans caused a $65,000 loss, then that amount is the extent of loss occasioned by that conduct and the Loan Note Guarantee is unenforceable to that extent, and the Loan Note Guarantee remains enforceable as to the remainder of the loan loss claim. FTB further contends, without admitting such determination is correct, that even if the refinancing of the interim loans were an unauthorized use of loan funds, the proof shows that the loss could only have approximately amounted to $662,500 ($710,000 in refinanced interim loans less $47,500 authorized refinancing), while the loan loss claim was in excess of $1,000,000. Therefore, under the USDA's and the hearing officer's reasoning, FTB argues that $337,500 is owed on its claim.

The Court finds this argument persuasive. The hearing officer emphasized that "any losses" would be unenforceable where the loan funds are used for purposes not "specifically approved" by the USDA in its Conditional Commitment for Guarantee. Impliedly, any loss would be unenforceable as long as loan funds were used for purposes not specifically approved. However, that statement relates back to the sentence immediately preceding it, which states, "The Loan Note Guarantee will be unenforceable by the Lender to the extent any loss is occasioned by . . . negligent servicing . . . ." Thus, the

54

lender cannot enforce the Loan Note Guarantee to the extent that such loss was caused by negligent servicing.

The hearing officer noted that MMF incurred approximately $65,000 in unexpected fees in the form of pre-payment penalties. The hearing officer opined that the pre-payment fees contributed to the downfall of the business. However, in reaching this conclusion the hearing officer neglected to take into account the fact that MMF was current on it payments until it lost its contracts with Chrysler and Breed Technologies and Ganton Industries made cutbacks from Magna Metal's Pulaski plant. From the record, more than the $65,000 in pre-payment fees contributed to MMF's downfall.

To be sure, MMF improperly used loan proceeds in excess of $710,000 to pay off the bridge loans used to purchase or lease the equipment from LTI, which was contrary to the stated purpose of the loan as presented to the USDA. PUB certified that the B&I loan was to be used for the purchase of new equipment and to refinance $47,500 in debt, and its failure to assure that the collateral was unencumbered and that loan proceeds went to its stated purpose instead of paying off bridge loans constituted negligent servicing. This breach was material. However, the question remains whether the entire loss was occasioned by the negligent servicing.

In his opinion, the Deputy Director stated:

I also reject [First Tennessee's] challenge to RBCS's conclusions that it would not have approved the loan guarantee if it had known that the loan would end up as a refinancing loan. As already discussed, that the

55

collateral was eventually secured as promised does not mitigate the risk inherent in loaning such a large sum of money to a borrower who did not own what it said it owned, and whose equity position was overstated. This deviation from the approved contract was a material breach . . . . While [First Tennessee] represents that the outcome of the transaction was as contemplated, RBCS was not given the opportunity to consider whether it should guarantee the loan under the actual circumstances of its execution. Therefore, [First Tennessee's] assertion that RBCS would have approved the guarantee is mere speculation.

(Docket Entry No. 11, Certified transcript, Volume II at 927).

Ultimately, PUB did in fact obtain a first priority security interest in the purchased equipment shortly after the closing of the loan, albeit not as contemplated by the terms of the Conditional Commitment. Moreover, Beasley stated that if interim loans were to have been used to purchase equipment, the USDA most likely would have approved them. Id., Vol. I at 158. If the use of the interim loans had been approved, MMF would have still lost its two biggest contracts and ostensibly filed for bankruptcy as a result. The hearing officer and Deputy Director appear to ignore these facts and instead place the entire amount of the loss on FTB because PUB and MMF did not abide by the specific terms of the agreement and that "but for" the negligent servicing by the lender the Agency allegedly would not have made the loan. By this reasoning, the Agency could deny the loss claim years later if MMF were to go bankrupt for whatever reasons. Accordingly, the Court finds that on this issue the Agency's decision to deny the entire loan loss claim is arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law; in excess of the USDA's statutory authority or limitations; and unsupported by substantial evidence.

The terms of the agreement and regulations stipulate that the loss must be caused by the negligent servicing. Based on the record, the financing costs of the interim loans caused a $65,000 loss. Further, the proof shows that $710,000 of the loan proceeds went towards unauthorized purposes, namely the interim loans. This amount is reduced by $47,500 because that amount was authorized to be used for refinancing. Therefore, the total amount attributable to the negligent servicing is $727,500. The loan loss claim filed by FTB was for $1,086,873.84. Accordingly, the Court shall award FTB $359,373.84 on its loan loss claim.

## IV. CONCLUSION

Based on the reasons stated above, the Court finds in favor of the Plaintiff, First Tennessee Bank National Association and shall award it $359,373.84 on its Loss Claim.

**ENTERED** this the 31st day of March, 2008.

WILLIAM J. HAYNES, JR.
United States District Judge

Case 1:05-cv-00027   Document 24   Filed 03/31/08   Page 57 of 57 PageID #: 164